McGEE, Chief Judge.
 

 *732
 
 Eliazar Juan Mendoza ("Defendant") appeals his convictions for felony sexual child abuse, first-degree rape, first-degree sexual offense, and indecent liberties with a child. Defendant contends the trial court erred by (1) precluding Defendant from fully cross-examining certain expert witnesses, and (2) admitting certain expert testimony over Defendant's objections. We find no error.
 

 I.
 
 Background
 

 Defendant and Mirna Solace ("Ms. Solace") were married for about fifteen years and four children were born of the marriage. Their eldest daughter, G.J., who was born on 8 March 1996, had a close relationship with Defendant, her father, and enjoyed spending time with him. When G.J. was nine years old, Ms. Solace told G.J. that she and Defendant "were going to take a break and that [the children might] not be able to see [Defendant] because they were going to split." The family was living in a townhouse in the Sugar Creek apartment complex in Winston-Salem, where G.J. shared a room with her younger sister, Y.J. They shared a bunk bed, with G.J.'s bed on the bottom and Y.J.'s bed on the top.
 

 G.J. testified that on the night Ms. Solace told her that she and Defendant had decided to separate, Defendant came into her bedroom around midnight. G.J. thought Defendant was coming to say goodnight, but Defendant got in bed next to her and unzipped her footie pajamas. Defendant took G.J.'s foot out of the pajamas and slipped his shorts off. Defendant said "hush, ... it [is] going to hurt." Defendant got on top of G.J. and penetrated her vagina with his penis. Defendant held her wrists above her head and began moving back and forth. G.J. whimpered but stopped when Defendant again told her to hush. Y.J. was asleep in
 
 *733
 
 the top bunk bed and did not wake up. Defendant stopped moving back and forth and G.J. felt something wet against her thigh. G.J. testified that Defendant "walked out [of the bedroom] as if nothing had happened." The next day, G.J. felt sore in her vaginal area and stayed in bed all day. She did not tell anyone what happened with Defendant the night before.
 

 A few nights later, Defendant again came into G.J.'s bedroom around midnight and got in her bed. He unzipped her pajamas, "spread [her] legs open ... [and] penetrated [her] vaginally." Y.J. was asleep in the top bunk bed. Defendant "started moving back and forth and held ... [G.J.'s] arms up ... above [her] head[.]" G.J. cried softly but did not scream out or yell. Defendant told G.J. not to tell anyone.
 

 On a third occasion shortly thereafter, Defendant came into G.J.'s bedroom while she and Y.J. were asleep on the floor in opposite corners of the room. Defendant had a children's book in his hand and told G.J. he was going to read to her. After reading one page from the book, Defendant got underneath G.J.'s blanket, removed her shorts and underwear, spread her legs open, and penetrated her vaginally with his penis. Defendant was not wearing a condom and ejaculated on G.J.'s stomach. Y.J. did not wake up at any point. G.J. testified that, over the next two
 
 *831
 
 years, when Defendant was not traveling for work, he raped her approximately two times per week.
 

 When G.J. was eleven years old, Ms. Solace accused Defendant of cheating on her and told him she "didn't want him in the house anymore[.]" Ms. Solace refused to let Defendant sleep in their bedroom that night, so Defendant made the children sleep downstairs with him on the living room floor. G.J. slept next to Defendant. After all the children were asleep, Defendant woke G.J. up by shaking her, pulled down her pants and underwear, and opened her legs. G.J. tried to push Defendant away, but Defendant told her not to move and she stopped resisting because she believed Defendant would hurt her. Defendant penetrated her vaginally with his penis and then ejaculated onto her thigh.
 

 When G.J. was thirteen, Defendant moved to Kannapolis. G.J. testified Defendant raped her once when she and her siblings visited him in Kannapolis. G.J. stopped visiting Defendant when she was fourteen years old.
 

 G.J. testified that, when she was in middle school, she began struggling academically and having problems at home. She also began secluding herself and arguing with her siblings. G.J. felt angry "[f]or allowing [herself] to carry such a burden, and for letting [the sexual abuse]
 

 *734
 
 continue for so long." She began cutting herself and taking OxyContin pills. She experienced recurrent nightmares and multiple anxiety attacks.
 

 When G.J. was sixteen years old, she attended a church service at which Victoria Burgos, the daughter of Pastor Mario Burgos ("Pastor Burgos"), shared an experience of past sexual abuse. One year later, in late July or early August 2013, G.J. told her mother Defendant had sexually abused her when she was nine years old. Ms. Solace called Pastor Burgos and told him about G.J.'s allegations against Defendant. Pastor Burgos and his family came over to Ms. Solace's apartment and Ms. Solace appeared to be "in shock." Pastor Burgos told her the abuse would have to be reported to the police, and he called the police about a week later.
 

 Officer M.L. Mitchell ("Officer Mitchell") of the Winston-Salem Police Department ("WSPD") testified he received a call on 9 August 2013 "in reference to an [alleged] indecent liberties with a minor." Officer Mitchell responded to 4039 Bethania Station Road, where he spoke with Pastor Burgos and Ms. Solace. With Pastor Burgos translating from Spanish to English, Ms. Solace told Officer Mitchell that G.J. said she had been sexually abused by Defendant. G.J. was in a different room during this initial conversation. Officer Mitchell then interviewed G.J. privately. G.J. told Officer Mitchell she had been sexually assaulted by Defendant "approximately [ten] times total, [ten] different times between [nine] and [ten] years old to [fifteen] years old." G.J. said the assaults occurred at the Sugar Creek apartment complex and Defendant's house in Kannapolis. Officer Mitchell testified:
 

 [G.J.] said that her father would ... come into her bedroom after she had already gone to bed. He would get on top of her, [and] undress her until she was fully naked.... [S]he said that [Defendant] would then insert his penis into her vagina, and would hold her down by her shoulders with ... his hands. And [she] stated that he would stay in that position until he ejaculated. And then she stated that ... he would touch her all over her body in various places. And then once he was done, he would get up and walk out of the room without saying anything to her.
 

 G.J. said she had attempted to resist Defendant only once, when she was about twelve years old, but Defendant "just push[ed] down on her harder." Officer Mitchell referred the case to the WSPD Criminal Investigations Division.
 

 *735
 
 WSPD Detective Robert Williams ("Det. Williams"), who had special training in interviewing children and investigating alleged child sexual abuse, interviewed G.J. alone on 14 August 2013. Det. Williams asked G.J. what prompted her to finally come forward with the sexual abuse allegations, and she said "she couldn't hold it in anymore, she just needed to tell someone, and the first person she told was her mother." Det. Williams testified G.J. gave him an account that was
 
 *832
 
 largely consistent with her testimony at trial. Det. Williams also interviewed Pastor Burgos and Ms. Solace. Det. Williams told Ms. Solace that G.J. should have a comprehensive medical examination.
 

 Dr. Meggan Goodpasture ("Dr. Goodpasture"), a physician at Wake Forest Baptist Medical Center ("WFBMC") and Brenner's Children Hospital ("BCH"),
 
 [1]
 
 examined G.J. on 17 September 2013. Prior to the medical examination, G.J. spoke with Cynthia Stewart ("Ms. Stewart"), a social worker at WFBMC and BCH. Ms. Stewart's role was to "gather[ ] [information about G.J.'s] social history ... [and] complet[e] a diagnostic interview" to help "inform [Dr. Goodpasture's] medical examination." Dr. Goodpasture testified that, during her medical examination, she noticed "very faint superficial scars on [G.J.'s] left forearm, which were well healed." Dr. Goodpasture also performed vaginal and anal exams on G.J. She testified that G.J.'s "anatomy appeared completely normal." Dr. Goodpasture found G.J. had "no vaginal bleeding, discharge or lesions[,] ... [and] no abnormal [anal] dilat[ion] or fissures or scars." She testified that "there was at least a number of months since [G.J.'s] last contact with [Defendant]" and that "most of the time, after children disclose a history of sexual abuse, their [physical] exams are completely normal." Dr. Goodpasture also "conducted testing [on G.J.] for sexually transmitted infections, which [came back] 'negative.' " She recommended G.J. receive therapy.
 

 Ms. Stewart testified as an expert in interviewing children in cases of suspected abuse or neglect. Ms. Stewart met with G.J. before G.J.'s medical examination "to make sure that [Dr. Goodpasture] knew exactly how to physically examine her[.]" Ms. Stewart's description of her interview with G.J. was largely consistent with G.J.'s testimony at trial, including Ms. Stewart's testimony that, during the interview,
 

 *736
 
 [G.J.] voiced several things that were consistent with her being in distress, and that she mentioned how she felt responsible. She talked about the negative consequences that she perceived that could be there. She talked about feeling so bad that she wanted to hurt herself. She talked about being very angry all the time and upset about things, [being] on edge.
 

 In Ms. Stewart's opinion, the characteristics she observed in G.J. were consistent with past sexual abuse.
 

 Blair Cobb ("Ms. Cobb"), a licensed clinical social worker and pediatric therapist at Family Preservation Services, testified as an expert in child counseling. Ms. Cobb first met with G.J. in early November 2013. Ms. Cobb testified that, at that meeting, G.J. exhibited the following:
 

 Primarily symptoms of anxiety, nightmares, difficulty concentrating, difficulty sleeping. [G.J.] also discussed re-experiencing symptoms of memories and of a traumatic event. She had symptoms of hypervigilance, [such as being] easily startled, always looking out for danger or things to occur and avoidance; not wanting to be around things that reminded her of what had occurred. She also expressed irritability and anger.... She reported to me that she was sexually abused by her father.
 

 Ms. Cobb told G.J. they "could move forward with trauma-focused cognitive behavioral therapy, and ... explained to her what that treatment outlined, and scheduled her next session."
 

 Ms. Cobb testified that any time a client "[came] in ... having [experienced] a traumatic event," she would discuss different symptoms associated with post-traumatic stress disorder ("PTSD"), consider whether the client "[met] the three different clusters of symptoms-meaning avoidance, ... re-experiencing and hypervigilance, [and if so,] ... move forward with the diagnosis." Ms. Cobb testified she used a "psychological [assessment] tool to help assist with asking a patient questions directly associated with [PTSD]. And ... it's broken down into age ranges. So for [G.J.'s] age group, it directly asks questions related to those three clusters [of symptoms]." Ms. Cobb testified that, after
 
 *833
 
 conducting these assessments on G.J., she "diagnosed [G.J. with] PTSD." When asked by the State, Ms. Cobb agreed that, while PTSD requires a traumatic event, "that traumatic event could be anything traumatizing[.]"
 
 *737
 
 Ms. Cobb and G.J. met for approximately eight counseling sessions. Each session focused on traumatic events in G.J.'s past. Ms. Cobb "only ask[ed] open-ended questions; no details in regards to [specific incidents]-it's all based on [the client's] memory and what they would like to discuss at that time." G.J. told Ms. Cobb she began drinking alcohol and engaging in recreational prescription drug use around the ninth grade, and that she had self-harmed by cutting herself. Ms. Cobb testified that "substance abuse is definitely associated with a child who has experienced a traumatic event[,]" and that "[c]utting is usually exhibited in children who do experience symptoms of depression, anxiety or trauma-related symptoms."
 

 Defendant also presented witness testimony. Joyce Vargas ("Ms. Vargas"), Defendant's niece, testified she visited Defendant, Ms. Solace, and their children in Winston-Salem every summer from 2005 to 2009. Ms. Vargas said the bunk beds that G.J. and Y.J. slept in were noisy and hit the wall if anyone moved in them. Ms. Vargas testified that, during her visits, G.J. seemed happy. Ms. Vargas also never observed anything strange about Defendant's behavior.
 

 Lizbeth Izquierdo ("Ms. Izquierdo"), who was Defendant's live-in girlfriend when he lived in Kannapolis, testified about Defendant's interactions with G.J. during the children's visits to their house in 2009 and 2010. Ms. Izquierdo testified G.J. appeared "happy" during those visits and Ms. Izquierdo never witnessed anything that would lead her to believe Defendant had raped G.J. Ms. Izquierdo did not recall Defendant spending time with G.J. outside Ms. Izquierdo's presence. Although Defendant would sometimes leave their bedroom at night to "make sure that [the children] were going to sleep[,]" Ms. Izquierdo never noticed him leaving for longer than a few minutes.
 

 Defendant testified in his own defense. He denied ever having raped, inappropriately touched, or vaginally penetrated G.J.
 

 Warrants for Defendant's arrest were issued on 30 May 2014 and 2 June 2014. A grand jury indicted Defendant on 27 October 2014 for multiple counts each of first-degree rape of a child, first-degree sexual offense, felonious child abuse by the commission of a sexual act, and taking indecent liberties with a child.
 

 The State served notice of expert witnesses on 24 November 2014, indicating it would call Dr. Goodpasture, Ms. Stewart, and Ms. Cobb to testify. The State attached reports prepared by Dr. Goodpasture and Ms. Stewart regarding their evaluations of G.J. Defendant filed a "Motion for
 
 *738
 
 Reports and Other Materials of State's Expert Witnesses" on 29 January 2015, seeking a court order
 

 requiring the State to produce to [Defendant] all expert reports, material and opinion basis discoverable pursuant to [N.C. Gen. Stat. §] 15A-903 and to specifically direct each such expert who is anticipated to testify to prepare a meaningful and detailed report concerning each expert's examination and opinion and the basis thereof.
 

 The State produced additional discovery on 18 February 2015. Defendant filed a motion
 
 in limine
 
 to exclude Ms. Stewart and Ms. Cobb from testifying as expert witnesses "as a sanction for the [State's] violation of discovery rules[.]" At a hearing on the motion on 18 February 2015, Defendant sought "either to exclude the expert opinions of the two witnesses, [Ms. Cobb] and/or [Ms. Stewart], ... or ... a continuance ... [to] prepare[ ] to defend those [opinions] ...." The trial court granted a continuance and the case was continued until 13 April 2015.
 

 The jury found Defendant guilty on all counts on 20 April 2015.
 
 [2]
 
 The trial court sentenced Defendant as a Prior Record Level II to five consecutive sentences of 288 to
 
 *834
 
 355 months' imprisonment. Defendant gave oral notice of appeal in open court.
 

 II.
 
 Ms. Stewart's Letters to the Editor
 

 A.
 
 Standard of Review
 

 Defendant first argues the trial court erred by not admitting into evidence three letters to the editor Ms. Stewart wrote and that were published in the
 
 Winston-Salem Journal
 
 in 2003. According to Defendant, "the letters represented [Ms.] Stewart's possible bias or prejudice in child advocacy matters[,]" and he should have been permitted to cross-examine Ms. Stewart about the content of the letters.
 

 "In reviewing trial court decisions relating to the admissibility of expert testimony evidence, [our Supreme] Court has long applied the deferential standard of abuse of discretion. Trial courts enjoy wide latitude and discretion when making a determination about the admissibility of [expert] testimony."
 
 State v. King
 
 ,
 
 366 N.C. 68
 
 , 75,
 
 733 S.E.2d 535
 
 , 539-40 (2012) (citation and internal quotation marks omitted). The trial court's
 
 *739
 
 decision will not be disturbed on appeal unless "the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."
 
 State v. Ward
 
 ,
 
 364 N.C. 133
 
 , 139,
 
 694 S.E.2d 738
 
 , 742 (2010) (citation and internal quotation marks omitted).
 

 Even when an abuse of discretion occurs, a defendant is not entitled to a new trial unless the error was prejudicial.
 
 See
 

 State v. Cook
 
 ,
 
 193 N.C.App. 179
 
 , 185,
 
 666 S.E.2d 795
 
 , 799 (2008) (citation omitted). Prejudicial error exists "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2015). Defendant bears the burden of showing prejudice.
 

 Id.
 

 B.
 
 Analysis
 

 We note initially that Ms. Stewart's letters to the editor do not appear in the record on appeal.
 
 See
 

 Fickley v. Greystone Enterprises, Inc.
 
 ,
 
 140 N.C.App. 258
 
 , 259,
 
 536 S.E.2d 331
 
 , 332 (2000) (observing that "[e]ffective appellate review ... [is] made more difficult by the filing of an incomplete record on appeal."). The State failed to serve timely notice of approval or objections to Defendant's proposed record as required by North Carolina Rule of Appellate Procedure Rule 11(b). As a result, Defendant's proposed record became the settled record on appeal.
 
 See
 
 N.C.R. App. P. 11(b) (2016). It is unclear why Defendant did not include Ms. Stewart's letters in his proposed record.
 
 [3]
 

 This Court's review is typically limited to the record on appeal, and "[m]atters discussed in the brief but outside the record will not be considered."
 
 Hudson v. Game World, Inc.
 
 ,
 
 126 N.C.App. 139
 
 , 142,
 
 484 S.E.2d 435
 
 , 437-38 (1997). However, in the present case, we are able to conclude from the record before us that even if Ms. Stewart's letters were erroneously excluded, the error was harmless.
 

 The trial court denied Defendant's motion to admit Ms. Stewart's letters based on its determination that "[the letters were] about a lot more than child abuse.... They're about newspapers and DSS and the like[.]" N.C. Gen. Stat. § 8C-1, Rule 403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2015). Defendant
 
 *740
 
 contends the probative value of Ms. Stewart's letters exceeded any of the concerns set forth in Rule 403, because they were "the only evidence offered to show prejudice on the part of [Ms.] Stewart[,]" and
 

 regard[ed] [Ms.] Stewart's thoughts and outrage about child abuse, including her advocacy for children who had been abused and killed by their parents. [The letters] also evidence[d] [Ms. Stewart's] belief that not enough is being done to protect children ... [and] reflect[ed] [Ms.] Stewart's
 
 *835
 
 beliefs, and potential prejudice and bias, about advocating for children.
 

 Thus, Defendant argues, "the trial court abused its discretion by precluding ... Defendant from cross-examining [Ms.] Stewart on her possible bias based on the letters." Moreover, Defendant submits that "but-for the trial court's denial of cross-examination, [Defendant] would have had the opportunity to confront [Ms.] Stewart about her potential prejudice and bias against him, possibly leading to a different result at trial[.]" These arguments are without merit.
 

 Contrary to Defendant's contention, the trial transcript plainly reflects that he was permitted to cross-examine Ms. Stewart about her "possible bias or prejudice in child advocacy matters." Specifically, defense counsel cross-examined Ms. Stewart as follows:
 

 [DEFENSE]: Now, would you describe yourself more as a child advocate than a forensic interviewer?
 

 [MS. STEWART]: Uhm-
 

 [STATE]: Objection to the characterization, Your Honor.
 

 [COURT]: Well, she can answer it however she feels would be appropriate.
 

 [MS. STEWART]: In my role with medical evaluation of children, I do-I have a passion for what I do. I have a passion for doing it appropriately. I have a passion for following the standards that are set forth. I also have a passion for the safety and protection of children who have been hurt and abused.
 

 [DEFENSE]: Do you recall writing some letters to the editor in 2003 expressing that passion quite strongly?
 

 [MS. STEWART]: Sure.
 

 *741
 
 ...
 

 [DEFENSE]: Ms. Stewart, did you write a series of letters to the editor on the subject of child abuse?
 

 [MS. STEWART]: I remember, but I don't remember exactly what I wrote.
 

 [DEFENSE]: May I approach the witness?
 

 [COURT]: I'm not going to allow those letters in. I'm sustaining the objection. I don't want anymore [sic] talk about them.
 

 [DEFENSE]: Well, would it be fair to say, then, you are strongly passionate on this subject?
 

 [MS. STEWART]: I have been working in the field of child abuse and neglect for 30 years. It would be hard to be doing my job for that long and not have some passion about what I do.
 

 In light of Ms. Stewart's own testimony, it is difficult to see how admitting the letters-that, we note, predated Ms. Stewart's interview with G.J. by a decade-would have provided any necessary additional insight into "[Ms.] Stewart's thoughts and outrage about child abuse, including her advocacy for children who had been abused ... by their parents." Defendant has failed to demonstrate a reasonable possibility of a different result at trial had the letters been admitted.
 
 See
 

 State v. Beach
 
 ,
 
 333 N.C. 733
 
 , 742,
 
 430 S.E.2d 248
 
 , 253 (1993) (holding erroneous exclusion of relevant testimony was not prejudicial where "defendant was able to elicit substantial evidence of a similar nature[.]").
 

 III.
 
 Untimely Disclosure of Expert Testimony
 

 A.
 
 Standard of Review
 

 Defendant next argues the trial court erred by permitting Ms. Stewart to testify about information in her report and Ms. Cobb to testify about information in her treatment records. Defendant contends the State violated N.C. Gen. Stat. § 15A-903(a)(2) by not sending Ms. Stewart's report and Ms. Cobb's records to defense counsel until February 2015. According to Defendant, he was prejudiced by the admitted testimony because he "did not have time to adequately prepare to effectively cross-examine [Ms.] Stewart and [Ms.] Cobb on the undisclosed opinions." We review the trial court's decisions for abuse of discretion.
 
 See
 

 State v. Blankenship
 
 ,
 
 178 N.C.App. 351
 
 , 356,
 
 631 S.E.2d 208
 
 , 211-12 (2006)
 

 *742
 
 (holding trial court abused its discretion in permitting expert to testify, where State violated statutory disclosure requirements by "fail[ing] to provide any notice whatsoever to [the] defendant that it would be calling any law enforcement officer
 
 *836
 
 or expert to testify concerning the process of manufacturing methamphetamine.").
 

 B.
 
 Analysis
 

 N.C. Gen. Stat. § 15A-903(a)(2) provides that, upon motion of a criminal defendant, the trial court must order
 

 [t]he prosecuting attorney to give notice to the defendant of any expert witnesses that the State reasonably expects to call as a witness at trial. Each such witness shall prepare, and the State shall furnish to the defendant, a report of the results of any examinations or tests conducted by the expert. The State shall also furnish to the defendant the expert's curriculum vitae, the expert's opinion, and the underlying basis for that opinion. The State shall give the notice and furnish the materials required by this subsection within a reasonable time prior to trial, as specified by the court.
 

 N.C. Gen. Stat. § 15A-903(a)(2) (2015). Where discovery is "voluntarily made in response to a request or written agreement, the discovery is deemed to have been made under an order of the court[.]" N.C. Gen. Stat. § 15A-902(b) (2015). Once a party has provided discovery, whether voluntarily or mandatorily, "there is a continuing duty to provide discovery and disclosure."
 
 State v. Ellis
 
 ,
 
 205 N.C.App. 650
 
 , 655,
 
 696 S.E.2d 536
 
 , 539 (2010) (citation and quotation marks omitted); N.C. Gen. Stat. § 15A-907 (2015). If a party fails to comply with these statutory mandates, a trial court may,
 
 inter alia
 
 , "[g]rant a continuance" or "[p]rohibit the party from introducing [the] evidence not disclosed[.]"
 
 See
 
 N.C. Gen. Stat. §§ 15A-910(a)(2)-(3) (2015) ;
 
 State v. Hodge
 
 ,
 
 118 N.C.App. 655
 
 , 657,
 
 456 S.E.2d 855
 
 , 856 (1995) (" N.C. Gen. Stat. § 15A-910 ... empowers the court to apply sanctions for noncompliance.... Although the court has the authority to impose such discovery violation sanctions, it is not required to do so."). "The purpose of discovery under our [criminal] statutes is to protect the defendant from unfair surprise by the introduction of evidence he cannot anticipate."
 
 Blankenship
 
 ,
 
 178 N.C.App. at 354
 
 ,
 
 631 S.E.2d at 210
 
 (citation and quotation marks omitted).
 

 The State served notice of expert witnesses to Defendant on 24 November 2014. The notice listed Dr. Goodpasture, Ms. Stewart, and Ms. Cobb, and indicated the State would make the reports of
 
 *743
 
 each expert regarding G.J. available to Defendant "during the regular course of discovery." The State attached curricula vitae ("CV") for Dr. Goodpasture and Ms. Stewart, and stipulated that Ms. Cobb's CV would be "forthcoming."
 

 The State provided initial discovery to Defendant on 2 December 2014. This initial disclosure included Dr. Goodpasture's full report about her medical examination of G.J.; a two-page report prepared by Ms. Stewart after her interview with G.J., stating her impressions and recommendations; and "about a [thirty] page report" by Ms. Cobb regarding "her visits with [G.J.], which ... detail[ed] [Ms. Cobb's] comprehensive clinical assessment."
 

 Defendant filed a "Motion for Reports and Other Materials of State's Expert Witnesses" on 29 January 2015, in which he requested
 

 an [o]rder requiring the State to produce to the defendant all expert reports, material and opinion basis discoverable pursuant to [N.C.G.S. §] 15A-903 and to specifically direct each such expert who is anticipated to testify to prepare a meaningful and detailed report concerning each expert's examination and opinion and the basis thereof.
 

 At a hearing on 4 February 2015, the trial court concluded the State had provided sufficient discovery with respect to Dr. Goodpasture, but instructed the State to "ask [Ms. Stewart and Ms. Cobb] to couch their diagnosis in the form of opinion and ... in the report that they produce [to the defense] ... be specific as to what their opinion is." The State subsequently provided Defendant with some further discovery, including additional therapy notes received from Ms. Cobb after the original discovery and "a revised letter [from Ms. Cobb] outlining the basis of her opinion[.]" These were produced to Defendant on 14 February 2015 and 16 February 2015, respectively. The State also provided Defendant with a DVD recording of Ms. Stewart's interview with G.J. on 16 February 2015.
 

 *837
 
 At a hearing on 18 February 2015, defense counsel told the trial court Defendant
 

 would need either to exclude the expert opinions of the two witnesses, [Ms. Cobb] and/or [Ms. Stewart], on the grounds that we have not had time to prepare for those opinions provided to us on essentially Monday morning or we need a continuance on those because we simply are not prepared to defend those at this point without further investigation and possible experts that may need to be retained by the defense.
 

 *744
 
 Pursuant to Defendant's request, and as authorized by N.C.G.S. § 15A-910(a)(2), the trial court continued the matter until 13 April 2015.
 

 Although Defendant characterizes Ms. Stewart's and Ms. Cobb's testimony as "unanticipated," he does not identify which specific portions of either witness's testimony he contends were "undisclosed." Defendant observes generally that "[w]hile [Ms.] Stewart's report was not admitted into evidence, she still referred to [it] throughout [her] testimony. Likewise, [Ms.] Cobb testified about information in her treatment records." However, as Defendant concedes, both Ms. Stewart's report and Ms. Cobb's treatment records were made available to Defendant in February 2015, and the trial court granted Defendant approximately two additional months to review the evidence and prepare to cross-examine the witnesses at trial.
 

 Defendant's argument that he "did not have time to adequately prepare to effectively cross-examine [Ms.] Stewart and [Ms.] Cobb on the undisclosed opinions" fails in light of the fact that the trial court granted a continuance upon Defendant's late receipt of additional materials from the State. Under N.C.G.S. § 15A-910(a), granting a continuance is as much a "sanction" as "prohibiting [a] party from introducing undisclosed evidence," and whether and which to impose are at the trial court's discretion.
 
 See
 

 State v. Herring
 
 ,
 
 322 N.C. 733
 
 , 747-48,
 
 370 S.E.2d 363
 
 , 372 (1988) ("The sanction for failure to make discovery when required is within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of discretion.");
 
 State v. McDougald
 
 ,
 
 38 N.C.App. 244
 
 , 258,
 
 248 S.E.2d 72
 
 , 83 (1978) ("When a party to a criminal proceeding fails to comply with discovery requirements, the trial court may impose sanctions upon that party. These sanctions include holding the party in contempt, ordering discovery, granting a continuance or recess, prohibiting the party from introducing the evidence or entering other appropriate orders. The particular sanction to be imposed rests within the sound discretion of the trial court." (citations omitted)). Indeed, at the hearing on 18 February 2015, Defendant explicitly requested "
 
 either
 
 to exclude the expert opinions ...
 
 or
 
 ... a continuance[.]"
 

 The cases Defendant cites are unavailing. In
 
 State v. Cook
 
 ,
 
 362 N.C. 285
 
 ,
 
 661 S.E.2d 874
 
 (2008), the State provided the defendant with an expert's report one day prior to the date trial was set to begin. The defendant immediately sought a continuance, but the trial court denied the motion and allowed the trial to proceed as scheduled. Our Supreme Court held that the trial court abused its discretion by denying the defendant's request for a continuance, because "the State's last-minute piecemeal disclosure of its expert's ... written report was not 'within a
 
 *745
 
 reasonable time prior to trial' as required by N.C.G.S. § 15A-903(a)(2)."
 

 Id.
 

 ,
 
 362 N.C. at 292
 
 ,
 
 661 S.E.2d at 878
 
 . The Court was "satisfied that a continuance would have alleviated any 'unfair surprise' to [the] defendant, and would have afforded the defense [an] opportunity to meet [the State's] evidence."
 

 Id.
 

 ,
 
 362 N.C. at 295
 
 ,
 
 661 S.E.2d at 880
 
 (citations and internal quotation marks omitted). In
 
 State v. Moncree
 
 ,
 
 188 N.C.App. 221
 
 ,
 
 655 S.E.2d 464
 
 (2008), this Court held the trial court improperly permitted an agent for the State Bureau of Investigation ("SBI") to testify as a lay witness. We concluded that because the agent's testimony was in fact expert opinion testimony, it should have been disclosed to the defendant prior to trial pursuant to N.C.G.S. § 15A-903(a)(2).
 
 [4]
 

 ibr.US_Case_Law.Schema.Case_Body:v1">See
 

 id.
 
 ,
 
 188 N.C.App. at 226-27
 
 ,
 
 655 S.E.2d at 468
 
 .
 
 *838
 
 In contrast to
 
 Moncree
 
 , Defendant was aware that Ms. Stewart and Ms. Cobb would offer expert testimony at trial. Further, unlike in
 
 Cook
 
 , the trial court granted Defendant a continuance upon his late receipt of additional discovery from the State. Defendant has failed to demonstrate the trial court abused its discretion by permitting Ms. Stewart and Ms. Cobb to testify about expert opinions that were disclosed to Defendant "within a reasonable time prior to trial."
 

 IV.
 
 Cobb's PTSD Testimony
 

 Preservation of Error
 

 Defendant next argues the trial court committed prejudicial error by allowing Ms. Cobb to testify that she "diagnosed [G.J. with] PTSD." According to Defendant, Ms. Cobb "impermissibly vouched for [G.J.,] the prosecuting witness" by "corroborat[ing] G.J.'s testimony that the alleged sexual assault by [Defendant] was the
 
 source
 
 of the resulting PTSD."
 

 The State responds that despite "challeng[ing] Ms. Cobb's overall qualifications to render testimony that G.J. suffered from PTSD[,]" Defendant "failed to challenge and preserve for appellate review the admissibility of the overall diagnosis of PTSD." We agree Defendant failed to preserve this argument for appellate review.
 

 During Ms. Cobb's testimony, defense counsel stated in
 
 voir dire
 
 that Defendant
 

 *746
 
 would lodge an objection to [Ms. Cobb] as an expert witness giving that opinion [that G.J. suffered from PTSD or had symptoms of PTSD]. We have no objection to her being-testifying that she's a therapist and testifying what she did [with G.J.] in the therapy, but to render the opinion that [G.J.] suffers from or suffered from post[-]traumatic stress disorder,
 
 we would contend requires a medical diagnosis to be a medical opinion
 
 .
 

 The State responded that North Carolina law
 

 does not require the testimony of a medical doctor, but it does require the testimony of someone who is familiar with the criteria of the diagnosis of post[-]traumatic stress disorder and has, in fact, made that diagnosis and can testify as to what the particular criteria is [sic] that was present in the particular child that resulted in that diagnosis.
 

 According to the State, Ms. Cobb would testify that she
 

 has a set criteria [for diagnosing PTSD] that is well accepted in the field of therapeutic services, that she, in fact, did an assessment [of G.J.], and based on her assessment, it was her opinion that the child was suffering from several criteria that were consistent with [PTSD].
 

 The State also noted that
 

 the law does limit the State in how far we can go with that.... We are not allowed to ask what the cause of the trauma is, only that sexual abuse could be one of many factors. And the State certainly would request a limited instruction from the Court that this [testimony] is only to be considered for corroboration purposes[.]
 

 Defense counsel agreed that "where an expert testifies the victim is suffering from PTSD, ... the testimony must be limited to the corroboration of the victim and could not be admitted ... for the sole purpose of proving that a rape or a sexual abuse has, in fact, occurred." When the trial court overruled Defendant's objection to Ms. Cobb's PTSD testimony, defense counsel requested in the absence of the jury that the court give the limiting instruction "at the time of [Ms. Cobb's] testimony regarding the corroboration purposes only so the jury doesn't get confused."
 

 When the jury returned to the courtroom, the trial court instructed it as follows:
 

 *747
 
 Okay. Now, the testimony that you all are going to hear from this witness is what's called opinion testimony, and it's going to be admitted solely for the purpose of corroborating other testimony. You're going to hear evidence about post[-]traumatic stress disorder.
 

 *839
 
 You're not to consider any evidence of [PTSD] as evidence of whether or not the offense charged in this case actually occurred; but, rather, you can receive and consider that evidence solely for two purposes: One purpose is to corroborate the testimony of witnesses that you have previously heard testify in this case. And the second reason is to explain, if you so find, conduct or behavior of the alleged victim.
 

 So this ... witness qualifies as an expert. She is an expert. I'll give you more instructions about how you're-what you are to do with expert testimony before you begin your deliberations.
 

 Defendant did not object to the instruction as given. When Ms. Cobb subsequently testified that, after performing a psychological assessment "directly associated with post[-]traumatic stress disorder," she "diagnosed [G.J. with] PTSD," Defendant objected "[on the] same grounds as previously stated in this area."
 

 At trial, although Defendant objected contemporaneously to Ms. Cobb's statement that she "diagnosed [G.J. with] PTSD," he did not do so on the basis that the testimony impermissibly vouched for G.J.'s credibility or the veracity of the sexual abuse allegations. Defendant's "previously stated" ground for objecting to Ms. Cobb's PTSD testimony was that "a licensed clinical social worker is not sufficiently qualified to give a medical opinion or a medical diagnosis of post[-]traumatic stress disorder, which is a documented psychiatric disorder[.]" Thus, when defense counsel objected to Ms. Cobb's statement that she "diagnosed PTSD" on "the same grounds as previously stated in this area," counsel was ostensibly referring to its earlier contention that Ms. Cobb was "not sufficiently qualified to give a medical opinion or a medical diagnosis of [PTSD]."
 
 [5]
 

 This conclusion is consistent with defense counsel's statements at a 4 February 2015 hearing on Defendant's request that the State specify
 
 *748
 
 the bases for the opinions of its expert witnesses. There, counsel said of Ms. Cobb: "[T]he only thing I can reference [as] an opinion is ... the statement ... that [G.J.] suffers from PTSD. If that in fact is [Ms. Cobb's] opinion I need to know that that's her opinion and how she comes to that diagnosis
 
 because she's not a medical doctor
 
 and there is nothing in her report that indicates that."
 

 Defendant also submitted motions
 
 in limine
 
 on 16 February 2015 to exclude certain expert testimony. With respect to Dr. Goodpasture and Ms. Stewart
 
 only
 
 , Defendant argued the trial court should prohibit any opinion "to the effect that a finding of no physical evidence of molestation is not inconsistent with molestation" because "admission of this evidence could only be used
 
 to improperly bolster the testimony of the prosecuting witness
 
 , which is the sole evidence in this case of the alleged abuse." Defendant also asked that the court prohibit Ms. Cobb "from referencing in any way that the prosecuting witness has been diagnosed with post [-]traumatic stress disorder [;]" however, Defendant's only arguments in support of this request were that
 

 [Ms.] Cobb, a licensed social worker, is not qualified to make and the [S]tate has not offered any evidence through any other expert as to how such diagnosis was made or if it was made. The admission of such evidence without ... a properly qualified expert witness would violate Rule 403 in that it would be more prejudicial than probative in its value. Further, the admission of such evidence ... would violate [N.C.G.S. §] 15A-903 as no such evidence from any medical expert was proffered through discovery.... Further, the admission of such testimony ... would violate Rule 703 of the Rules of Evidence in that [
 
 Ms.
 
 ]
 
 Cobb is not qualified as an expert in the area of post[-]traumatic stress disorder diagnosis
 
 .
 

 Defendant did not argue, as he did with respect to Dr. Goodpasture and Ms. Stewart, that Ms. Cobb's PTSD opinion testimony might "be used to improperly bolster the testimony of the prosecuting witness."
 

 *840
 
 The argument Defendant makes on appeal-that Ms. Cobb's testimony about her PTSD diagnosis impermissibly "corroborated G.J.'s testimony that the alleged sexual assault by [Defendant] was the
 
 source
 
 of the resulting PTSD"-was never raised before the trial court. North Carolina Rule of Appellate Procedure 10(a)(1) requires that a criminal defendant present specific and detailed objections to a trial court's evidentiary rulings in order to preserve an issue for appellate review.
 
 See
 

 *749
 

 State v. Rayfield
 
 ,
 
 231 N.C.App. 632
 
 , 637,
 
 752 S.E.2d 745
 
 , 751 (2014). For example, in
 
 State v. Rainey
 
 ,
 
 198 N.C.App. 427
 
 ,
 
 680 S.E.2d 760
 
 (2009), the defendant argued on appeal that certain evidence was barred by the Confrontation Clause. This Court held the defendant failed to properly preserve the issue for appellate review because, while defendant had objected at trial on general constitutional and due process grounds, he "did not specifically object on Confrontation Clause grounds."
 
 Id.
 
 at 433,
 
 680 S.E.2d at 766-67
 
 . The general constitutional objections were insufficient under N.C.R. App. P. 10(a)(1) to preserve the more specific Confrontation Clause argument for appellate review. Likewise, "[a] party must make a specific objection to
 
 the content of the testimony
 
 or the qualifications of a witness as an expert in a particular field; a general objection will not preserve the matter for appellate review."
 
 State v. Faulkner
 
 ,
 
 180 N.C.App. 499
 
 , 512,
 
 638 S.E.2d 18
 
 , 28 (2006) (emphasis added). In this case, Defendant's objections based on Ms. Cobb's qualifications to give a medical opinion were insufficient to preserve an argument that Ms. Cobb's PTSD testimony impermissibly vouched for G.J.'s credibility.
 

 Defendant cites
 
 State v. Mendoza-Mejia
 
 , --- N.C. App. ----,
 
 780 S.E.2d 891
 
 ,
 
 2015 WL 7729215
 
 (2015), a recent unpublished decision of this Court, that held certain witness testimony impermissibly vouched for the credibility of the prosecuting witness. This Court concluded that
 

 in juvenile sexual abuse cases where the State relies on the victim's testimony without any physical evidence, witnesses are not permitted to testify that they believe the victim's testimony or otherwise suggest that the victim is telling the truth. This Court has held that this type of vouching testimony is prejudicial and therefore reversible error.
 

 Id.
 

 , --- N.C. App. at ----, 780 S.E.2d at ----,
 
 2015 WL 7729215
 
 at *1. However, Defendant overlooks the fact that in
 
 Mendoza-Mejia
 
 , the defendant specifically "objected to [the two witnesses'] testimony
 
 on the ground that
 
 [it] ... impermissibly vouched for [the victim's] credibility, but the trial court overruled the objection[s]."
 

 Id.
 

 (emphasis added). The same is not true in Defendant's case. Without specifically objecting to Ms. Cobb's PTSD testimony on the ground that it impermissibly vouched for G.J.'s credibility, Defendant failed to preserve this argument.
 

 "Unpreserved error in criminal cases ... is reviewed only for plain error."
 
 State v. Lawrence
 
 ,
 
 365 N.C. 506
 
 , 512,
 
 723 S.E.2d 326
 
 , 330 (2012) ;
 
 see also
 

 State v. Wiley
 
 ,
 
 355 N.C. 592
 
 , 615,
 
 565 S.E.2d 22
 
 , 39-40 (2002) (observing that "plain error analysis applies only to jury instructions
 
 *750
 
 and evidentiary matters[.]"). "To have an alleged error reviewed under the plain error standard, the defendant must 'specifically and distinctly' contend that the alleged error constitutes plain error."
 
 Lawrence
 
 ,
 
 365 N.C. at 516
 
 ,
 
 723 S.E.2d at
 
 333 (citing N.C.R. App. P. 10(a)(4) ). Because Defendant "has not alleged plain error in his arguments to this Court, he has waived appellate review ... on such grounds."
 
 State v. Thibodeaux
 
 ,
 
 352 N.C. 570
 
 , 582,
 
 532 S.E.2d 797
 
 , 806 (2000) (citations omitted).
 

 V.
 
 G.J.'s Sexual History
 

 A.
 
 Standard of Review
 

 Defendant also contends the trial court erroneously precluded Defendant from cross-examining Ms. Stewart and Ms. Cobb about information in their treatment records regarding G.J.'s sexual activity with partners other than Defendant. Defendant argues this evidence was not barred by the "rape shield law" codified in N.C. Gen. Stat. § 8A-1, Rule 412, and that the trial court improperly concluded the evidence was more prejudicial than probative. "We review the trial court's rulings as to relevance with great deference.... [T]he same deferential standard of
 
 *841
 
 review [applies] to the trial court's determination of admissibility under Rule 412."
 
 State v. Davis
 
 ,
 
 237 N.C.App. 481
 
 , 488,
 
 767 S.E.2d 565
 
 , 570 (2014) (quoting
 
 State v. Khouri
 
 ,
 
 214 N.C.App. 389
 
 , 406,
 
 716 S.E.2d 1
 
 , 12-13 (2011) ).
 

 B.
 
 Analysis
 

 At trial, Defendant sought to cross-examine the State's expert witnesses about G.J.'s consensual sexual activity with other individuals. During Ms. Cobb's testimony, defense counsel argued in
 
 voir dire
 
 that the information was relevant
 

 first of all, because [Ms. Cobb] incorporated [the information] in the material she used to render an expert opinion. Anything that an expert has relied upon under [evidentiary] Rule 702 on the basis thereof of [evidentiary] Rule 705, when requested by counsel must be produced and is subject to cross-examination. And in this case, [Ms. Cobb has] very clearly incorporated it in her opinion. She's referred multiple times to the assessment and the factors in it in supporting her opinion of PTSD and all of which she's rendered an opinion upon. This would formulate an underlying basis of the opinion by her own testimony, so anything in that is entitled to be cross-examined on without relevance to Rule 412 or otherwise. The relevance is
 
 *751
 
 she's used it in formulating her opinion. And as an expert, anything considered by the expert is fair game to be cross-examined upon, whether or not it is actually incorporated-
 

 COURT: So you think [Rule] 412-if it's her opinion, 412 doesn't even matter?
 

 [DEFENSE COUNSEL]: Correct.... Once an expert incorporates material like that into their review, ... if you tender that person as an expert, then we're entitled to full and wide cross-examination on everything that expert considered whether they chose to incorporate it in their opinion or not.
 

 The State contended that evidence of G.J.'s consensual sexual activity fell squarely within Rule 412's "rule of exclusion." The trial court then permitted both Defendant and the State to question Ms. Cobb about the extent to which G.J.'s sexual activity "assisted [her] in formulating [the] opinion that [G.J.] suffered from post[-]traumatic stress disorder [.]" Defense counsel had the following exchange with Ms. Cobb:
 

 [DEFENSE COUNSEL]: You said you wouldn't have taken that into account in doing your diagnosis of PTSD, correct?
 

 [MS. COBB]: I wouldn't have.
 

 [DEFENSE COUNSEL]: So in that case, you took this information and discarded it before incorporating your opinion, correct?
 

 [MS. COBB]: The fact that [G.J.] had any acts currently of consensual sexual acts, anything, that runs the gamut, from kissing on down the line, did not formulate my opinion in the diagnosis.
 

 [DEFENSE COUNSEL]: Okay. But you asked about it?
 

 [MS. COBB]: I did.
 

 [DEFENSE COUNSEL]: And so you took that information into account whether you chose to incorporate it in your opinion or not, correct?
 

 [MS. COBB]: I took it into account, and based on-and in that-taking into account, as it was not relevant, it did not sway my opinion.
 

 *752
 
 [DEFENSE COUNSEL]: So you, as an expert, made a determination that you did not feel it was relevant to your opinion, correct?
 

 [MS. COBB]: It was not relevant to the diagnosis I made.
 

 [DEFENSE COUNSEL]: But you did, in fact, seek that information in your form and obtained it and then chose, in formulating your opinion, not to incorporate it?
 

 [MS. COBB]: It's not relevant in the diagnoses [sic] of PTSD.
 

 [DEFENSE COUNSEL]: And that is what your opinion is, that it's not relevant, correct?
 

 [MS. COBB]: It's not anywhere in the criteria, so it's my opinion and multiple people's opinion.
 

 The trial court ruled it would "exclude any evidence whatsoever as to any sexual activity by the victim." When defense counsel reasserted its desire to cross-examine Ms. Cobb about G.J.'s sexual activity, the trial court
 
 *842
 
 responded: "Well, [Ms. Cobb] just got through saying that she took nothing into account involving [G.J.'s] sexual history.... So ... I don't even feel the need to do a balancing test .... [T]here's no relevance to it whatsoever."
 

 Rule 412 provides that ordinarily, "sexual behavior of [a] complainant is irrelevant to any issue in the prosecution" and is thus inadmissible as evidence.
 
 See
 
 N.C. Gen. Stat. § 8C-1, Rule 412 (2015) ;
 
 Davis
 
 ,
 
 237 N.C.App. at 488
 
 ,
 
 767 S.E.2d at 569-70
 
 . The statute also sets forth four exceptions to the otherwise categorical exclusion, none of which Defendant argues applied in this case.
 
 See
 
 N.C. Gen. Stat. § 8C-1, Rule 412(b) (2015). Pursuant to Rule 412, before a complaining witness may be questioned about sexual activity other than the sexual act(s) at issue in the trial,
 

 the proponent of such evidence shall first apply to the court for a determination of the relevance of the sexual behavior to which it relates.... [T]he court shall conduct an
 
 in camera
 
 hearing ... to consider the proponent's offer of proof and the argument of counsel, including any counsel for the complainant, to determine the extent to which such behavior is relevant. In the hearing, the proponent of the evidence shall establish the basis of admissibility of such evidence.... If the court finds that the evidence is relevant, it shall enter an order stating that the evidence
 
 *753
 
 may be admitted and the nature of the questions which will be permitted.
 

 N.C. Gen. Stat. § 8C-1, Rule 412(d) (2015).
 

 Defendant cites
 
 State v. Martin
 
 , --- N.C. App. ----,
 
 774 S.E.2d 330
 
 (2015), for the unremarkable proposition that Rule 412 's exceptions are "not confined to those listed in the statute."
 
 (Def. br. at 22)
 
 In
 
 Martin
 
 , this Court reversed a trial court's determination that "[certain] evidence was
 
 per se
 
 irrelevant because the evidence did not fit under any of the four exceptions provided in our Rape Shield Statute[.]"
 

 Id.
 

 at ----,
 
 774 S.E.2d at 332
 
 . We noted that "our Court has [previously] held that there may be circumstances where evidence which touches on the sexual behavior of the complainant may be admissible even though it does not fall within one of the categories in the Rape Shield Statute."
 

 Id.
 

 at ----,
 
 774 S.E.2d at 335-36
 
 (citations omitted);
 
 see also
 

 State v. Younger,
 

 306 N.C. 692
 
 , 698,
 
 295 S.E.2d 453
 
 , 456 (1982) (holding that the four exceptions in the rape shield statute are not "the sole gauge for determining whether evidence is admissible in rape cases."). The
 
 Martin
 
 defendant sought to introduce evidence for the purpose of showing the victim had a motive to falsely accuse him of sexual assault. We held that the trial court
 

 should have looked beyond the four [exceptions in Rule 412 ] to determine whether the evidence was, in fact, relevant to show [the victim's] motive to falsely accuse [the defendant] and, if so, conducted a balancing test of the probative and prejudicial value of the evidence under Rule 403 or [whether it] was otherwise inadmissible on some other basis[.]
 

 Id.
 

 at ----,
 
 774 S.E.2d at
 
 336 ;
 
 see also
 

 State v. Mbaya
 
 , --- N.C. App. ----,
 
 791 S.E.2d 266
 
 , 270-74 (2016) (discussing and distinguishing
 
 Martin
 
 ).
 

 In the present case, the trial court followed the precise approach prescribed in
 
 Martin
 
 . Although Defendant sought to introduce evidence about G.J.'s sexual history for a purpose that did not fit within any of Rule 412 's four exceptions, the trial court nonetheless conducted a
 
 voir dire
 
 hearing on the matter, allowing arguments from both Defendant and the State regarding the purported relevancy of the evidence. After Ms. Cobb was questioned extensively regarding the extent to which G.J.'s sexual conduct with other individuals informed Ms. Cobb's PTSD diagnosis, the trial court concluded the evidence was not relevant. Having found the evidence irrelevant, the trial court was not required under
 
 Martin
 
 to proceed to a balancing test of the probative and prejudicial
 
 *754
 
 value of the evidence. Pursuant to the "great deference" accorded to a trial court's determinations of relevancy under Rule 412, and in light of Ms. Cobb's repeated statements that G.J.'s sexual history had no bearing whatsoever on her PTSD diagnosis, we conclude the trial court did not err in excluding the evidence as irrelevant. Moreover, "we review errors committed by the trial court in excluding relevant
 
 *843
 
 evidence under Rule 412 for prejudice."
 
 Davis
 
 ,
 
 237 N.C.App. at 489
 
 ,
 
 767 S.E.2d at 570
 
 . Even if G.J.'s sexual conduct with other individuals was erroneously excluded, Defendant presents no plausible argument that, had the jury heard this evidence, there is a reasonable possibility it would have reached a different result.
 

 VI.
 
 Conclusion
 

 For the reasons stated above, we find no error in Defendant's trial.
 

 NO ERROR.
 

 Judges DIETZ and TYSON concur.
 

 [1]
 

 Dr. Goodpasture testified that her role at Brenner Children's Hospital was to "provide both inpatient and outpatient consultations upon requests [sic] for children, whether [it involves] some concern for ... child physical abuse, child sexual abuse, [or] child neglect[.]"
 

 [2]
 

 In total, Defendant was convicted of five counts of first-degree rape, two counts of first-degree sexual offense, two counts of felonious child abuse by the commission of a sexual act, and four counts of taking indecent liberties with a child.
 

 [3]
 

 Defendant filed a motion with this Court on 4 May 2016 seeking to amend the record on appeal by adding the letters. The motion was denied on 12 September 2016.
 

 [4]
 

 Although the
 
 Moncree
 
 trial court erred in admitting the expert testimony, we held the error was not prejudicial because the defendant was aware that two other witnesses would offer substantially similar testimony and therefore "should have anticipated this evidence and should not have been unfairly surprised by [the SBI agent's] testimony[.]"
 

 Id.
 

 ,
 
 188 N.C.App. at 227
 
 ,
 
 655 S.E.2d at 468
 
 .
 

 [5]
 

 On appeal, Defendant does not challenge Ms. Cobb's qualifications to give a medical opinion or diagnosis regarding PTSD.