IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-450

Filed 18 June 2025

Pitt County, No. 21 CRS 1141

STATE OF NORTH CAROLINA

v.

PAUL EMMANUEL TATE, JR., Defendant.

Appeal by defendant from judgment entered 2 February 2023 by Judge Marvin K. Blount, III in Superior Court, Pitt County. Heard in the Court of Appeals 14 January 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General J. Joy Strickland, for the State.*
>
> *Cooley Law Office, by Craig M. Cooley, for defendant-appellant.*

STROUD, Judge.

Defendant Paul Tate appeals from judgment entered following a jury trial finding him guilty of second-degree rape. On appeal, Defendant contends the trial court's jury instructions violated his due process right to a unanimous jury verdict. Defendant also contends the trial court erred in denying his motion to dismiss because there was not sufficient evidence that Robin was incapable of consenting to sexual activity and that Defendant knew or should have known Robin was mentally incapacitated or physically helpless. Defendant also contends the trial court violated

his rights under the confrontation clause of the 6th Amendment of the United States Constitution by allowing expert testimony from employees of the State Crime Lab based in part on DNA test results generated by Sorenson, a private third-party laboratory, since the State did not present testimony from the Sorenson analyst who did the initial DNA testing. We have carefully analyzed these three issues and for the reasons discussed below, the trial court did not commit any reversible error.

## I.  Background

Defendant's indictment and conviction arose from an alleged sexual assault on Robin[1] which occurred on 1 June 2011. Robin testified she spent the day visiting some friends from high school in Greenville, North Carolina. After lunch, Robin and her friends went to the pool at her friend's apartment community. Robin testified that she had "a few beers" while at the pool that day, and eventually began "drinking a clear liquor . . . straight from the bottle."

Although Robin could "vivid[ly]" remember "going to the pool," she could not recall many details regarding the rest of her time there. One interaction she recalled, however, was with a group of "three guys that were hanging out . . . [and] playing beer pong[ ] . . . across the pool." One of these men presented Robin with the question of "[i]f [she] could handle him and his two friends." Following this interaction, the next thing Robin could remember was "[b]eing in a car, falling out of it, and throwing

---

[1] Stipulated pseudonym agreed to by the parties to protect the identity of the victim.

up." Robin recognized that it was now dark outside, at least two white men were in the car with her, and she had been taken to an apartment complex she did not recognize.

Robin's next memory was waking up on a bed with a guy behind her having vaginal sex with her. Robin could also remember a second man wearing swim trunks being "called in" and she was "motioned" to perform oral sex on him. After the second man left, the man behind Robin "motioned" a third man into the room, apparently for Robin to perform oral sex on him also. At this point, Robin began regaining awareness and "realized something wasn't right[.]"

The two men in the room began having a conversation and discussing how the second man "ran out of the room." Robin recognized "things stopped[ ]" and the two men left the room, presumably to "check [on] the friend that left[.]" After the men left, Robin fled the apartment. Robin ran to a nearby apartment complex she recognized because she had once lived there with her daughter's father. Someone at the complex assisted Robin in transporting her to the hospital. Robin was placed in a room at ECU Health's Emergency Department shortly "after midnight" on 2 June 2011.

While at the hospital, Robin had a sexual assault forensic examination performed by a nurse who had specialized training in performing such examinations. The nurse gathered samples and evidence from Robin and performed various examinations used for reported sexual assaults. In one of the forms filled out by the

Sexual Assault Nurse Examiner ("SANE"), she noted Robin had some "bleeding in her vaginal canal." After completion of this examination, the nurse packaged the samples in the sexual assault kit and delivered it to Detective Smith, a law enforcement officer with the Greenville Police Department assigned to the special victims' unit in 2011.

After receiving the sexual assault kit, Detective Smith went to the apartment complex where Robin and her friends went to the pool. The apartment community staff told Detective Smith neither of their security cameras covering the area were operational. Detective Smith placed Robin's sealed sexual assault examination kit and other evidence into a locker at the Greenville Police Department.

In his testimony, Detective Smith indicated the case went "inactive" for some time as there was not enough evidence to move forward any further. However, a few years later, James Tilly joined the Greenville Police Department on a federal grant designated to "help law enforcement track, catalogue, and test . . . untested [sexual assault] kits[.]" On 12 December 2017, Mr. Tilly acquired Robin's sealed, untested sexual assault kit and mailed it to Sorenson Labs, a private DNA testing facility in Utah. Sorenson's analysis of Robin's test kit returned positive for the presence of male DNA from her vaginal, rectal, and oral swabs. Mr. Tilley then sent these results to the North Carolina State Crime Lab in 2018. Cortney Cowan, forensic scientist with the State Crime Lab, reviewed the data compiled by Sorenson, extracted the "unknown component" of the DNA mixture, i.e., the male portion of the DNA, and

entered it into the State's DNA database.

In June or July of 2019, Detective Michael Cunningham with the Greenville Police Department was assigned to Robin's case. While reviewing Robin's case file and the DNA data, Detective Cunningham saw Defendant's DNA came back as an initial match for the male DNA extracted by the State Crime Lab. Detective Cunningham determined Defendant was incarcerated at Carteret Correctional Center and he began the process of obtaining a search warrant to collect Defendant's DNA. Detective Cunningham met with Defendant in November of 2019, read over the search warrant with Defendant and provided him a copy, and obtained a buccal swab from the inside of Defendant's cheek for further DNA testing. Detective Cunningham testified this additional DNA testing was routine practice to ensure the DNA of the suspect returned the same match as the initial report. Blood and urine samples were also obtained from Defendant using a State Bureau of Investigation suspect kit.

Tricia Daniels, a forensic scientist for the North Carolina State Crime Lab, tested the samples obtained from Defendant and compared them to the DNA profile generated by Sorenson from Robin's sexual assault test kit. At trial, after being tendered as an expert in her field, Ms. Daniels opined the DNA samples collected from Defendant were a probable match to DNA results generated by Sorenson. Specifically, she testified that

> [t]he probability of randomly selecting an unrelated

individual with a DNA profile that is consistent with the deduced DNA profile obtained from the sperm fraction of the vaginal swabs as provided by Sorenson Forensics item 1-1 is approximately 1 in 101 sextillion in the Caucasian population, 1 in 271 sextillion in the African-American population and 1 in 452 sextillion in the Hispanic population using the population databases generated by NIST.

On 25 October 2021, Defendant was indicted for one count of second-degree forcible rape against Robin. Trial began on 30 January 2023, and the jury returned a guilty verdict on 1 February 2023. Judgment was entered 2 February 2023. Defendant gave oral notice of appeal and timely filed written notice of appeal to this Court that same day.

## II.   Analysis

Defendant presents three main arguments on appeal. First, Defendant argues the trial court's jury instructions violated his due process right to a unanimous jury verdict. Second, Defendant argues the trial court erred in denying his motion to dismiss, contending the State did not present substantial evidence of each element of second-degree forcible rape. Finally, he argues the trial court violated his Confrontation Clause rights by allowing introduction of the private lab DNA results, through testimonies of State Crime Lab analysts, without also requiring the State to present the analyst who actually performed the analysis for testimony. We address each argument in turn.

## A.  Jury Instructions and Verdict

Defendant first argues the trial court's jury instructions and verdict sheets violated his due process right to a unanimous jury. At trial, Defendant's counsel objected to the jury instruction as including the constructive knowledge element of second-degree rape, arguing Defendant's indictment was premised only on actual knowledge of Robin's incapacitation. Defendant's counsel specifically objected to and challenged this instruction on due process grounds, contending Defendant was not put on notice of needing to prepare a defense as to allegedly having constructive knowledge of Robin's incapacitation. Defendant further contends this instruction was a "fatally ambiguous disjunctive instruction regarding the knowledge element[ ]" which denied Defendant the right to a unanimous jury verdict. We disagree.

"The Due Process Clause prohibits any state from depriving 'any person of life, liberty, or property, without due process of law.'" *State v. Joyner*, 284 N.C. App. 681, 693, 877 S.E.2d 73, 83 (2022) (quoting U.S. Const. amend. XIV). "When determining whether a defendant's due process rights were violated, we apply a *de novo* standard of review." *Id.* (citation omitted).

Defendant was indicted for one count of second-degree rape on 25 October 2021 for acts occurring in June of 2011. Because Defendant's actions giving rise to the indictment occurred in 2011, we must look to the version of North Carolina General Statute Section 14-27.3 ("the Statute") in effect at that time, which was later recodified as Section 14-27.22 by Session Law 2015-181, Section 4(a), effective 1

December 2015.[2]

North Carolina General Statute Section 14-27.3 provided, in relevant part:

> (a) A person is guilty of rape in the second degree if the person engages in vaginal intercourse with another person:
>
> > (1) By force and against the will of the other person; or
> >
> > (2) Who has a mental disability or who is mentally incapacitated or physically helpless, and the person performing the act knows or should reasonably know the other person has a mental disability or is mentally incapacitated or physically helpless.

N.C. Gen. Stat. § 14-27.3 (2011). Defendant's first argument on appeal centers mainly on Subsection (a)(2) of the Statute and the element "should reasonably know the other person . . . is mentally incapacitated or physically helpless." *Id.*

Defendant's indictment indicated

> [t]he jurors of the State . . . present that . . . [D]efendant . . . willfully and feloniously did carnally know and abuse [Robin], who was at the time was [sic] mentally incapacitated, physically helpless and by force and against her will. . . . [D]efendant knew that [Robin] was mentally incapacitated and was physically helpless."

Defendant specifically contends "[t]he State didn't charge [him] with a constructive knowledge offense, *i.e.*, while [he] didn't actually know or believe Robin was physically helpless and/or mentally incapacitated, the circumstances surrounding the

---

[2] Section 14-27.22 only changed the name of the offense to "second-degree forcible rape"; the elements remained the same. *See* S.L. 2015-181, § 4(a).

vaginal intercourse reasonably should've informed him Robin was one or both."

The trial court instructed the jury that "to find . . . Defendant guilty of this offense the State must prove . . . Defendant knew or should reasonably have known that the alleged victim was mentally incapacitated and/or physically helpless." Defendant argues the trial court should have only instructed the jury that Defendant "knew" Robin was mentally incapacitated, since that was the only language in Defendant's indictment. Because Defendant's indictment did not include the constructive knowledge language of "or should reasonably [have] known[,]" as outlined by the Statute, Defendant contends this instruction violated his due process right of a unanimous verdict by "allow[ing] the jury to potentially convict him for an offense not charged in the indictment." This argument is without merit.

In making his argument, Defendant relies heavily on our Supreme Court's decision in *State v. Gibson*, which provided "[i]t is an elementary rule in the criminal law that a defendant must be convicted, if at all, of the particular offense alleged in the bill of indictment." 169 N.C. 380, 382, 85 S.E. 7, 8 (1915).

> In *Gibson,* our Supreme Court reversed a conviction for obtaining money under false pretenses where the indictment alleged that the defendant had obtained $350.00 and the evidence was that the defendant signed and obtained a promissory note for that amount. The Court reasoned that there was a substantial difference between "money" and a "promissory note," and they concluded that the difference between the allegation and the evidence was fatal.

*State v. Walston*, 140 N.C. App. 327, 335-36, 536 S.E.2d 630, 636 (2000) (citations

omitted).  The reversal of the conviction in *Gibson* was "based on the assertion, not

that there is no *proof* of a crime having been committed, but that there is none which

tends to prove that the particular offense charged in the bill has been committed."

*Gibson*, 169 N.C. at 385, 85 S.E. at 9 (emphasis in original).

However, since *Gibson*, our North Carolina General Assembly has enacted

"short-form" indictment statutes that provide "it is not necessary [for an indictment]

to allege every matter required to be proved on the trial[.]"  N.C. Gen. Stat. § 15-

144.1(a) (2023).  "If the victim is a person who . . . is mentally incapacitated or

physically helpless, it is sufficient to allege that the defendant unlawfully, willfully,

and feloniously did carnally know and abuse a person who . . . was mentally

incapacitated or physically helpless[.]"  N.C. Gen. Stat. § 15-144.1(c).  An indictment

for second-degree rape need not allege every element of the crime to be proven at

trial, including the elements of knowledge or constructive knowledge as Defendant

argues.

Our Supreme Court recently upheld a short-form indictment for second-degree

rape where, similar to this case, the indictment did not specifically allege the element

of knowledge:

> A plain reading of section 15-144.1(c) demonstrates that
> the indictment here clearly alleged a crime and was not
> required to allege actual or constructive knowledge of the
> victim's physical helplessness. Certainly, such knowledge
> is an element of the offense and must be proven at trial,
> but the purpose of short-form indictments is to relieve the
> State of the common law requirement that every element

of the offense be alleged. In other words, while there is a knowledge element necessary to sustain a conviction at trial, that element is not required to be alleged in the indictment. It cannot reasonably be said that this indictment deprived [the] defendant of notice of the charge such that he could not prepare a defense, or that the court could not enter judgment.

*State v. Singleton*, 386 N.C. 183, 213, 900 S.E.2d 802, 823 (2024) (citations, quotation marks, and emphasis omitted).

Here, based on our Supreme Court's reasoning in *Singleton*, Defendant's indictment put him on sufficient notice of the alleged offense for him to reasonably anticipate needing to prepare a defense as to the element of knowledge. *See id.* The State's indictment was not fatally deficient in not including the element of constructive knowledge, nor was the trial court precluded from including it in the jury instruction due to its absence from the indictment.

Further, Defendant argues the "disjunctive instruction regarding the knowledge element[ ]" denied him of "his Sixth Amendment and due process right to a unanimous jury verdict for the charged offense." Specifically, Defendant contends instructing the jury that it could find he knew *or* reasonably should've known Robin's compromised state was "disjunctive" in allowing the jury two alternatives for returning a guilty verdict as to the single offense charged. We disagree.

As noted by our Supreme Court in *State v. Walters*, "[t]wo lines of cases have developed regarding the use of disjunctive jury instructions." 368 N.C. 749, 753, 782 S.E.2d 505, 507 (2016) (citations and quotation marks omitted). In *State v. Lyons*,

relying on *State v. Diaz*, 317 N.C. 545, 346 S.E.2d 488 (1986), our Supreme Court

provided that

> a disjunctive instruction, which allows the jury to find a defendant guilty if he commits either of two underlying acts, *either of which is in itself a separate offense,* is fatally ambiguous because it is impossible to determine whether the jury unanimously found that the defendant committed one particular offense.

330 N.C. 298, 302-03, 412 S.E.2d 308, 312 (1991) (emphasis in original).

> In contrast, this Court has recognized a second line of cases stemming from *State v. Hartness,* 326 N.C. 561, 391 S.E.2d 177 (1990), standing for the proposition that if the trial court merely instructs the jury disjunctively as to various alternative acts *which will establish an element of the offense,* the requirement of unanimity is satisfied. In this type of case, the focus is on the intent or purpose of the defendant instead of his conduct.

*Walters*, 368 N.C. at 753, 782 S.E.2d at 507-08 (emphasis in original) (citations, quotation marks, and brackets omitted).

Also, in *State v. Haddock*, this Court explained that "[t]o decide whether the underlying acts joined by the disjunctive are separate offenses or merely alternative ways to establish a single offense, this Court considers the gravamen of the offense, determined by considering the evil the legislature intended to prevent and the applicable statutory language." 191 N.C. App. 474, 480, 664 S.E.2d 339, 344 (2008) (citation omitted). This Court in *Haddock* explained "mental incapacity and physical helplessness are but two alternative means by which the force necessary to complete a rape may be shown, and not discrete criminal acts[.]" *Id.* at 481, 664 S.E.2d at 345.

Similarly, here, whether Defendant knew or reasonably should've known of Robin's compromised state "are but two alternative means by which" the element of knowledge "may be shown, and not discrete criminal acts[.]" *Id.*

Here, Defendant's case falls squarely into the second category identified in *Hartness* as the disjunctive elements of knowledge are not separate criminal acts, but merely alternative avenues to conclude the existence of a single element of the crime. *See State v. Hartness*, 326 N.C. 561, 567, 391 S.E.2d 177, 180-81 (1990).

We conclude no error in the trial court's jury instruction as the jury instruction was not "fatally" disjunctive and did not deny Defendant the opportunity to receive a unanimous jury verdict.

## B. Motion to Dismiss

Defendant next argues the trial court erred in denying his motion to dismiss, contending the State "failed to present substantial evidence regarding each element" of second-degree rape. Specifically, Defendant contends the State failed to present substantial evidence: (1) "proving Robin was incapable of consenting to the encounter . . . with [Defendant]"; and (2) "proving [Defendant] knew or reasonably should've known Robin was mentally incapacitated and/or physically helpless[.]" We disagree.

We review the issue of the denial of the motion to dismiss *de novo*:

> In evaluating the correctness of the trial court's decision concerning a motion to dismiss for insufficiency of the evidence, a reviewing court need determine only whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator, with

substantial evidence consisting of that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion. In the course of making this inquiry, the reviewing court must view the evidence in the light most favorable to the State, with the State being entitled to every reasonable intendment and every reasonable inference to be drawn therefrom. As long as the record contains substantial evidence, whether direct or circumstantial, or a combination, to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied. Whether the State presented substantial evidence of each essential element of the offense is a question of law, so, accordingly, we review the denial of a motion to dismiss de novo.

*State v. Elder*, 383 N.C. 578, 586, 881 S.E.2d 227, 234 (2022) (citations, quotation marks, and brackets omitted).

On the special verdict forms, the jury concluded "[t]he victim was mentally incapacitated[ ]" and "incapable of appraising the nature of the . . . conduct" and "incapable of resisting an act of vaginal intercourse[.]"  However, the jury also determined "[t]he victim was [not] physically helpless[.]"  Essentially, Defendant was convicted of second-degree forcible rape because he had intercourse with Robin, who was mentally incapable of assessing the nature of the act or resisting, and that Defendant knew or should have known of this mental incapability.  Defendant's conviction hinged on the elements of (1) "[b]y force and against the will" of another person "who was mentally incapacitated[,]" and (2) Defendant's knowledge of such mental incapacitation.  *See* N.C. Gen. Stat. § 14-27.3.  Defendant argues there was insufficient evidence as to either of these elements for his conviction.

Under North Carolina General Statute Section 14-27.20(2),[3] an individual is considered "[m]entally incapacitated" when "due to any act is rendered substantially incapable of either appraising the nature of his or her conduct, or resisting the act of vaginal intercourse or a sexual act." N.C. Gen. Stat. § 14-27.20(2) (2023).

Defendant argues "the only evidence" presented as to Robin's compromised state "came from Robin herself[,]" and this evidence was not sufficient to survive Defendant's motion to dismiss. However, even if the only evidence was Robin's testimony – and it was not in this case – "[o]ur courts have repeatedly held victim statements and testimony alone are sufficient evidence to support a conviction." *State v. Gibbs*, 293 N.C. App. 707, 713-14, 901 S.E.2d 649, 655 (2024) (citations omitted). Here, there was evidence supporting Robin's intoxication and her mental incapacity other than her testimony. In fact, some of this evidence came from Defendant's own comments to investigators: Detective Cunningham testified that when he met with Defendant in November of 2021, Defendant described Robin as a "drunk bitch" and "wasted" the night of the incident. Evidence of Robin's alcohol levels also corroborated her testimony about her intoxication.

During trial, Melanie Thornton, forensic scientist supervisor with the North Carolina State Crime Lab, was tendered and accepted without objection from

---

[3] During the time of Defendant's actions in 2011, the definition of mentally incapacitated was contained in North Carolina General Statute Section 14-27.1. This statute was later recodified as Section 14-27.20 by Session Law 2015-181, Section 2, effective 1 December 2015. The language of this section remained unchanged.

Defendant as an expert in the field of forensic toxicology. She testified as to the alcohol levels in Robin's blood and urine, collected at the hospital following the incident. Ms. Thornton testified Robin's urine sample returned "0.15 grams of alcohol per 100 milliliters" and her blood alcohol content ("BAC") returned "0.02 grams of alcohol per 100 milliliters[.]" These test results corroborate Robin's testimony regarding her mental state, and Defendant's statement to Detective Cunningham that Robin was "wasted" the night of the incident and further evidences Robin was mentally incapacitated and incapable of appraising the nature of the conduct and incapable of resisting an act of vaginal intercourse when taken in the light most favorable to the state.

Robin testified there were some holes in her memory and that she had difficulty remembering "in a chronological order" the events occurring that afternoon at the pool and into the evening. Though she did not remember exactly when she left the pool, nor under what circumstances, her next memory was "[b]eing in a car, falling out of it, and throwing up." Her next memory was "[c]oming to on [a] bed[ ]" with a man behind her having sex with her. All the while she "wasn't sure what was going on[.]" After another man entered the room, attempting to perform more sexual acts with her, Robin testified:

> That's when I realized something wasn't right and I tried
> – I knew I had to talk myself through and figure out what
> was going on because everything was – I was so confused,
> where I was, how I was there. I had to talk myself – you
> need to figure out what's going on. You need to figure

yourself out, you need to – I had to like have a conversation
with myself in my mind.

Robin's testimony, along with the testimony of Ms. Thornton corroborating the presence of alcohol in her system and Defendant's statements to Detective Cunningham Robin was a "drunk bitch" and was "wasted", is sufficient evidence to allow a reasonable jury to accept as true Robin was mentally incapacitated during the incident.

Defendant also argues there was insufficient evidence to prove Defendant was aware of Robin's mental incapacitation. But as noted above, Defendant described Robin as a "drunk bitch" and "wasted" the night of the incident to Detective Cunningham.

Viewed in the light most favorable to the State, we conclude the evidence presented was sufficient to allow a reasonable jury to accept as true that Robin was mentally incapacitated at the time of this incident, and that Defendant knew of such mental incapacitation. The trial court did not err in denying Defendant's motion to dismiss.

## C. Confrontation Clause

Defendant argues the trial court improperly allowed into evidence the DNA results generated by Sorenson, a private, third-party laboratory, "without [also] forcing the State to produce the . . . analyst who performed the . . . DNA testing[.]" Specifically, Defendant contends the DNA results from Sorenson was introduced

through testimony of Cortney Cowan and Tricia Daniels, both employees of the State Crime Lab, and his Sixth Amendment Confrontation Clause rights were violated when he was not given the opportunity to cross-examine the Sorenson analyst who conducted the analysis.

"The standard of review for alleged violations of constitutional rights is *de novo*. Once error is shown, the State bears the burden of proving the error was harmless beyond a reasonable doubt." *State v. Graham*, 200 N.C. App. 204, 214, 683 S.E.2d 437, 444 (2009) (citations omitted).

We first note Defendant's argument regarding the testimony of Ms. Cowan is an issue not properly preserved for appellate review. "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1).

Ms. Cowan testified that she had received the testing information from Sorenson and did a technical review of the data. She then took the "portion of the mixture that was from the unknown component" and entered this information into the DNA database to submit a "routine inquiry." In summary, Ms. Cowan did not compare the DNA information from Sorenson to a known sample from Defendant; she merely processed the Sorenson test results and submitted the unknown DNA sample to the DNA database. The database then matched the DNA profile to Defendant, and

Ms. Cowan sent the results "to the State Crime Lab" and notified Robin that there was "a positive hit in the DNA testing" in her case.

At trial, during Ms. Cowan's testimony, Defendant's counsel made four objections. The first three were general objections, indicating no specific ground for the objection. In the fourth and final objection, Defendant's counsel stated: "Objection; calls for hearsay." Ms. Cowan then testified about receiving the male DNA samples from Sorenson and sending them to the State Crime Lab.

In *State v. Mendoza*, this Court explained that

> North Carolina Rule of Appellate Procedure 10(a)(1) requires that a criminal defendant present *specific* and *detailed* objections to a trial court's evidentiary rulings in order to preserve an issue for appellate review. For example, in *State v. Rainey*, 198 N.C.App. 427, 680 S.E.2d 760 (2009), the defendant argued on appeal that certain evidence was barred by the Confrontation Clause. This Court held the defendant failed to properly preserve the issue for appellate review because, while [the] defendant had objected at trial on general constitutional and due process grounds, he did not specifically object on Confrontation Clause grounds.

250 N.C. App. 731, 748-49, 794 S.E.2d 828, 840 (2016) (emphasis added) (citations and quotation marks omitted).

In criminal cases, if an issue is unpreserved for appellate review through proper objection made to the trial court, the issue may still be reviewed by this Court under plain error review. *See* N.C. R. App. P. 10(a)(4). However, "[t]o have an alleged error reviewed under the plain error standard, the defendant must 'specifically and

distinctly' contend that the alleged error constitutes plain error." *State v. Lawrence*, 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012) (quoting N.C. R. App. P. 10(a)(4)) (other citations omitted). Here, in his brief on appeal, Defendant did not "specifically and distinctly" contend the issue was plain error. *See id.* Because Defendant did not present "specific and detailed objections" on grounds of Confrontation Clause violations at trial, nor did he allege plain error in his brief on appeal, the issue regarding Ms. Cowan's testimony was not properly preserved for this Court's review.

During the testimony of Ms. Daniels, however, counsel for Defendant did specifically object on Confrontation Clause grounds. Our analysis of any alleged Confrontation Clause violations will be confined only to the testimony of Ms. Daniels. Although some evidence regarding the Sorenson testing of the samples was presented through Ms. Cowan, Ms. Daniels was the witness who testified about the analysis of Defendant's DNA and the comparison of his DNA to the rape test kit information. Therefore, Defendant did not lose the opportunity to raise the Confrontation Clause argument by his failure to object to Ms. Cowan's testimony. *See State v. Whitley*, 311 N.C. 656, 661, 319 S.E.2d 584, 588 (1984) ("Where evidence is admitted over objection, and the same evidence has been previously admitted or is later admitted without objection the benefit of the objection is lost." (citation omitted)); *see also State v. Lewis*, 231 N.C. App. 438, 442, 752 S.E.2d 216, 219 (2013) (holding an issue was not preserved for this Court's review where the "defendant did not object to the evidence the first time it was introduced").

Ms. Daniels was the forensic scientist for the North Carolina State Crime Lab who analyzed the samples obtained from Defendant in 2019 and compared them to the DNA profile generated by Sorenson from Robin's sexual assault test kit.

In *Smith v. Arizona*, the United States Supreme Court explained "[t]he Confrontation Clause provides that 'in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him.' In operation, the Clause protects a defendant's right of cross-examination by limiting the prosecution's ability to introduce statements made by people not in the courtroom." 602 U.S. 779, 783-84, 219 L. Ed. 2d 420, 426 (2024) (brackets and ellipsis omitted) (quoting U.S. Const. amend. XI).

> The Clause's prohibition applies only to testimonial hearsay—and in that two-word phrase are two limits. First, in speaking about witnesses—or those who bear testimony—the Clause confines itself to testimonial statements[.]
>
> . . . .
>
> Second . . . , the Clause bars only the introduction of hearsay—meaning, out-of-court statements offered to prove the truth of the matter asserted. When a statement is admitted for a reason unrelated to its truth, we have held, the Clause's role in protecting the right of cross-examination is not implicated. That is because the need to test an absent witness ebbs when her truthfulness is not at issue.

*Id.* at 784-85, 219 L. Ed. 2d at 427 (citations and quotation marks omitted). The Court in *Smith* outlined a two-step approach to analyze when the Confrontation

Clause is implicated: first, the evidence being introduced by the State must be testimonial; second, it must be hearsay evidence, "offered to prove the truth of the matter asserted." *See id.* Here, Defendant contends the statements and results of the absent Sorenson analyst are both testimonial and hearsay in nature and the Confrontation Clause is implicated.

### 1. Hearsay

We must first consider whether the evidence from the DNA analysis by Sorenson was "offered to prove the truth of the matter asserted." *See id.* In *Smith*, the defendant was charged with various drug-related offenses after law enforcement "found a large quantity of what appeared to be drugs and drug-related items[ ]" in his possession. *Id.* at 789, 219 L. Ed. 2d at 430. The state then sent these seized items to the state crime lab for testing and analysis of the substances. *See id.* An analyst with the crime lab completed the requested testing, but at the trial, a "substitute" analyst was called to testify about the test results. *See id.* at 790, 219 L. Ed. 2d at 430-31. "Because [the substitute analyst] had not participated in the . . . case, [he] prepared for trial by reviewing [the original analyst]'s report and notes. And when [he] took the stand, he referred to those materials and related what was in them, item by item by item." *Id.* at 791, 219 L. Ed. 2d at 431. The defendant in *Smith* appealed his conviction, contending "the [s]tate's use of a 'substitute expert'—who had not participated in any of the relevant testing—violated his Confrontation Clause rights. . . . The real witness against him, [the defendant] urged, was [the original analyst],

through her written statements; but he had not had the opportunity to cross-examine her." *See id.*

As to whether the original analyst's lab results were hearsay and offered "for their truth[,]" the Court in *Smith* stated that

> [i]f an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts.
>
> . . . .
>
> Or said a bit differently, the truth of the basis testimony is what makes it useful to the prosecutor; that is what supplies the predicate for—and thus gives value to—the state expert's opinion.
>
> . . . .
>
> Or to see the point another way, consider it from the factfinder's perspective. In the view of the Arizona courts, an expert's conveyance of another analyst's report enables the factfinder to determine whether the expert's opinion should be found credible. That is no doubt right. The jury cannot decide whether the expert's opinion is credible without evaluating the truth of the factual assertions on which it is based. If believed true, that basis evidence will lead the jury to credit the opinion; if believed false, it will do the opposite. But that very fact is what raises the Confrontation Clause problem. For the defendant has no opportunity to challenge the veracity of the out-of-court assertions that are doing much of the work.

*Id.* at 795-96, 219 L. Ed. 2d at 434 (citations, quotation marks, and brackets omitted).

The Court concluded the defendant's Confrontation Clause rights may have been violated because the substitute analyst's testimony relied only on the results obtained

by the original analyst; his own personal knowledge of common lab practice and procedure never came into play. *See id.* at 799, 219 L. Ed. 2d at 436. "[T]he [s]tate used [the substitute analyst] to relay what [the original analyst] wrote down about how she identified the seized substances. [The substitute analyst] thus effectively became [the original analyst]'s mouthpiece." *Id.* at 800, 219 L. Ed. 2d at 437.

Recently, this Court was presented with a similar issue in *State v. Clark*, ___ N.C. App. ___, 909 S.E.2d 566 (2024). In *Clark*, this Court relied on *Smith* in holding that forensic lab results obtained by an original analyst cannot form the "basis" of a "substitute" expert's testimony, "[w]ithout independent testing on . . . [the] part [of the substitute expert.]" *Id.* at ___, 909 S.E.2d at 569.

After Ms. Daniels was tendered as an expert in the field of "forensic DNA analysis[,]" the following interaction occurred on direct examination by the State:

> Q. Ms. Daniels, first, I want to show you what's been marked as State's Exhibit 8. Can you tell me what that is? Do you recognize it?
>
> A. Yes, ma'am.
>
> Q. And how do you recognize it?
>
> A. State's Exhibit 8 is lab item number 2 that I received in this case. And the way that I recognize it is that it has our lab sticker on the outside of the envelope that bears our lab number, the item number, and it also has my initials and the date.
>
> Q. What was included in that envelope sent to you?
>
> A. A DNA standard from [Defendant].

. . . .

Q. Now, Ms. Daniels, I am showing you what has been marked as State's Exhibit 12, can you tell me what that is?

A. Yes, ma'am.

Q. What is it?

A. State's Exhibit 12 is the DNA extract from item 2 and, of course, mine in control. So it's basically my work product following my analysis.

. . . .

Q. Ms. Daniels, what were you asked to do with the samples that were sent to you in this particular case?

A. I received a – the standard, which is our item number 2, and was asked to compare it to a previous item, an item 1-1.

Q. And what was item 1-1?

A. Item 1-1 was a DNA profile generated from sperm fraction of the vaginal swabs.

Q. And who had performed the testing on those vaginal swabs?

A. That was performed by Sorenson Forensics.

Q. And that was a DNA profile that had been placed on file at the Crime Lab; is that right?

A. Yes, ma'am.

Q. And so your job, is it my understanding, was to compare –

A. Yes, ma'am.

Q. – the DNA profiles from item – that has been marked as

State's Exhibit 8 and compare it to the DNA profile submitted by Sorenson Labs; is that correct?

A. Yes, ma'am, that's correct.

Q. And how did you go about doing that?

A. Well, I went through my normal DNA process to develop a profile for item number 2, State's Exhibit 8, which is the standard from [Defendant]. And then following that I then performed a statistical analysis on that particular standard with the profile that was developed from item 1-1.

Q. And were the samples that you received in this case tested using the procedures you've already described?

A. Yes, ma'am.

Q. And were you able to form an opinion and obtain a result in that comparison?

A. Yes, ma'am.

Q. And what was your opinion?

. . . .

A. The DNA profile obtained from [Defendant] item 2 is included as a possible contributor to the deduced DNA profile obtained from the sperm fraction of the vaginal swabs, item 1-1 as provided by Sorenson Forensics.

Robin's sexual assault test kit was sent to Sorenson, a private lab, only for the purpose of "male screening[,]" a process of simply determining the presence of *any* male DNA. Sorenson then provides a "raw DNA profile[,]" which the State can then use to determine "how many people are in the DNA profile[ ]" and extract any "unknown component[s]" to enter into the State's database. In addition, to provide

context as to the role played by Sorenson, Detective Tilley testified that

> [p]rivate laboratories don't have access to the DNA databases that we utilize in forensic DNA casework so we have an agreement with those private laboratories . . . to receive the data that they generate in their casework. We do a full technical review of their data to ensure the quality of their results and to ensure that we agree with their conclusions that they generate. And the State Crime Laboratory is the laboratory that has access to these DNA databases.

Ms. Cowan had taken the Sorenson test results and submitted them to the DNA database which matched the male sample to Defendant. Sorenson's testing only identified the male portion of the DNA sample.

The case at bar is distinguishable from the scenarios presented in both *Smith* and *Clark*. For example, the substitute expert in *Smith* came to the same conclusions as the original analyst, relying only on the original analyst's notes and records. *See Smith*, 602 U.S. at 791, 219 L. Ed. 2d at 431 ("And [the substitute expert] did come to the same conclusion [as the original analyst], in reliance on [the original analyst]'s records."). Similarly, in *Clark*, the substitute expert was called to testify the substance obtained from the defendant was methamphetamine, the same conclusion drawn by the original analyst. *See Clark*, __ N.C. App. at ___, 909 S.E.2d at 567. Here, however, Ms. Daniels did not specifically testify about the lab results generated by Sorenson, nor the practices it may have used in obtaining the results. To the contrary, Ms. Daniels's testimony addressed her own practices and procedures, and the analyses she ran to match the DNA profile generated by Sorenson to Defendant's

DNA from the State's database.

But after determining that Defendant was a potential match to the DNA in the rape kit, Ms. Daniels then performed her own independent research and analyses, unlike the substitute experts in both *Smith* and *Clark*. The Sorenson DNA test results simply showed that some male DNA was present in the rape kit taken from Robin; the unknown analyst at Sorenson did not give any opinion on whose DNA was in the kit. However, the DNA profile from Sorenson did form part of the basis for Ms. Daniels's own analyses and trial testimony, and Ms. Daniels did not perform any independent tests on the rape test kit. The conclusions reached by Sorenson and Ms. Daniels were not the same, since Sorenson's analysis returned a result of some presence of male DNA in Robin's sexual assault test kit swabs and the adjoining DNA profile, while Ms. Daniels's analysis returned a match to Defendant's DNA, but the results from Sorenson served as the basis for the results obtained by Ms. Daniels. At trial, the evidence based on the DNA profile generated by Sorenson was presented as true and Ms. Daniels's opinions depended on the truthfulness of the DNA profile, since this is the profile used to identify Defendant after it was matched to the State database and then matched after analysis of the buccal swab from Defendant in 2019. *See Smith,* 602 U.S. at 780, 219 L. Ed. 2d at 425 ("The truth of the basis testimony is what makes it useful to the [s]tate; that is what supplies the predicate for—and thus gives value to—the state expert's opinion. And from the factfinder's perspective, the jury cannot decide whether the expert's opinion is credible without evaluating the

truth of the factual assertions on which it is based."). Because the DNA profile generated by Sorenson "gives value" to the match produced by Ms. Daniels, this out-of-court statement is hearsay since it was offered "for the truth" of Defendant being the perpetrator of this crime. *See id.*

### 2. *Testimonial Evidence*

The next question is whether the Sorenson lab test results were testimonial evidence. Even if the forensic results generated by Sorenson were hearsay, Defendant's Confrontation Clause rights were not implicated as they were not testimonial. The Confrontation Clause is not implicated unless the out-of-court statement offered against a defendant is both hearsay *and* testimonial. *See Smith*, 602 U.S. at 800, 219 L. Ed. 2d at 437 ("To implicate the Confrontation Clause, a statement must be hearsay ("for the truth") and it must be testimonial—and those two issues are separate from each other." (citation omitted)).

In *Smith*, the United States Supreme Court did not make a ruling on whether the out-of-court statements of the original analyst were testimonial, *see id.* at 800, 219 L. Ed. 2d at 437, as the only issue presented to the Supreme Court was whether they were offered "for their truth." *See id.* at 792-93, 219 L. Ed. 2d at 432.[4] Although

---

[4] The Supreme Court did not address the issue of whether the evidence was testimonial because it was not presented to the Court:

> But that issue is not now fit for our resolution. The question presented in Smith's petition for certiorari did not ask whether [the substitute analyst]'s out-of-court statements were testimonial. Instead, it took as a given that they were. That presentation reflected the Arizona Court

the United States Supreme Court did not rule on the issue of whether the statements were testimonial, it did "offer a few thoughts, based on the arguments made . . . , about the questions the state court might usefully address if the testimonial issue remains live."[5]  *Id.* at 801, 219 L. Ed. 2d 438.  The Court noted that the state court would need to "identify the out-of-court statement introduced, and must determine, given all the 'relevant circumstances,' the principal reason it was made."  *Id.* at 801-02, 219 L. Ed. 2d 437 (quoting *Michigan v. Bryant*, 562 U.S. 344, 369, 179 L. Ed. 2d 93, 114 (2011)).

Here, the out-of-court statement introduced was the DNA test results from Sorenson which identified male DNA in the swabs in the rape test kit.  So we must consider "given all the relevant circumstances, the principle reason" the Sorenson test was made.  *See id.* (citation and quotation marks omitted).

In *Bullcoming v. New Mexico*, the United States Supreme Court addressed use of a "Report of Blood Alcohol Analysis" prepared by an analyst at the New Mexico Department of Health, Scientific Laboratory Division.  564 U.S. 647, 652-53, 180 L.

---

of Appeals' opinion. As described earlier, that court relied on the "not for the truth" rationale we have just rejected. It did not decide whether [the substitute analyst]'s statements were testimonial. Nor, to our knowledge, did the trial court ever take a stance on that issue. Because we are a court of review, not of first view, we will not be the pioneer court to decide the matter.

*Smith*, 602 U.S. at 801, 219 L. Ed. 2d at 437 (citations and quotation marks omitted).

[5] The Supreme Court vacated the judgment of the Arizona Court of Appeals and remanded the case for that court "to address the additional issue of whether [the substitute analyst]'s records were testimonial (including whether that issue was forfeited)[.]"  *Id.* at 803, 219 L. Ed. 2d at 439.

Ed. 2d 610, 616 (2011). The Supreme Court determined that the report was "[a] document created *solely* for an 'evidentiary purpose,' . . . made in aid of a police investigation, [and] ranks as testimonial." *Id.* at 664, 180 L. Ed. 2d at 623 (emphasis added) (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311, 174 L. Ed. 2d 314, 321 (2009)). In *State v. Craven*, three different SBI agents had performed testing of substances seized from the defendant on different "buy dates," but only one of the agents testified at trial. 367 N.C. 51, 54, 744 S.E.2d 458, 460 (2013). Agent Schell testified about the test results of the other two agents as well as her own testing, but she

> merely parroted Agent Shoopman's and Agent Allcox's conclusions from their lab reports. Like the lab report in *Bullcoming*, these lab reports contained an analyst's certification prepared in connection with a criminal investigation or prosecution. Specifically, Agent Shoopman's and Agent Allcox's certifications stated: "This report represents a true and accurate result of my analysis on the item(s) described." There is no doubt that the lab reports were documents created solely for an evidentiary purpose, made in aid of a police investigation, and rank as testimonial. Thus, the statements introduced by Agent Schell constituted testimonial hearsay, triggering the protections of the Confrontation Clause.

*Id.* at 56-57, 744 S.E.2d at 461 (citations, quotation marks, brackets, and ellipses omitted). Our Supreme Court then concluded that the "admission of the out-of-court testimonial statements . . . was error[.]" *Id.* at 57, 744 S.E.2d at 462. Likewise, in *State v. Clark*, this Court addressed testimony by a surrogate expert who relied on testing by another analyst who was "unavailable to testify" about a "crystalline

substance" found in a search of the defendant's home. *Clark*, ___ N.C. App. at ___, 909 S.E.2d at 567. The expert opined that the substance was methamphetamine but based his opinion only on the testing done by the other analyst. *See id.* This Court held that the statements in the lab report were "testimonial as a matter of law[ ]" because they were "created *solely* to aid in the police investigation of [the d]efendant[.]" *Id.* at ___, 909 S.E.2d at 570.

But the facts and circumstances we are presented with here differ from those in the cases noted above, which dealt with laboratory testing done to identify controlled substances seized from or found with the defendant or to determine the defendant's blood alcohol level. Here, the testing involved has two phases. First, samples were taken from Robin immediately after the alleged rape, and those samples were tested for the presence of male DNA by Sorenson. Next, DNA samples were taken from Defendant, analyzed, and compared to the Sorenson test results, leading to Ms. Daniels's opinion outlined above. Here, the facts and circumstances are more similar to those presented in *Williams v. Illinois*, 567 U.S. 50, 183 L. Ed. 2d 89 (2012).

First, we recognize that *Smith v. Arizona* abrogated *Williams v. Illinois* on the issue of whether the test result were hearsay or used for the truth of the matter asserted. But *Smith* specifically did not address the second part of the *Williams* analysis, whether the test results were testimonial evidence, and *Smith* did not

overrule or disapprove of this portion in *Williams*.[6]  As noted by the United States

Supreme Court in *Smith*, the *Williams* Court "failed to produce a majority opinion[,]"

*Smith*, 602 U.S. at 788, 219 L. Ed. 2d at 429, and its opinions "have sown confusion

in courts across the country about the Confrontation Clause's application to expert

opinion testimony."  *Id.* at 789, 219 L. Ed. 2d at 430 (citation and quotation marks

omitted).  However, the Court in *Smith* indicated much of the "confusion" coming

from the opinions in *Williams* centered on the issue of whether out-of-court

statements are to be considered hearsay.  *See id.* ("Some courts have applied the

*Williams* plurality's 'not for the truth' reasoning to basis testimony, while others have

adopted the opposed five-Justice view. This case emerged out of that muddle."

(footnote omitted)).  As to whether the out-of-court statements are testimonial, the

Court in *Smith* essentially left that an open-ended question for lower courts to decide.

*See id.* at 801-02, 219 L. Ed. 2d at 438.  And in *Williams*, five justices supported the

majority's conclusion that the DNA test results generated by the analysis of the

samples from the victim were not testimonial, although only four agreed on the

rationale.[7]

---

[6] The Supreme Court noted that "Smith argues that the State has forfeited the argument [that the report was not testimonial]: Arizona, he says, 'gave no hint in the proceedings below that it believed the [substitute analyst]'s statements were anything but testimonial.' . . . The State denies that assertion, pointing to a passage about *Williams* in its lower court briefing. . . . The dispute is best addressed by a state court. So we return the testimonial issue, including the threshold forfeiture matter, to the Arizona Court of Appeals."  *Smith*, 602 U.S. at 801, 219 L. Ed. 2d at 438.

[7] Justice Thomas agreed with this result as to whether the evidence was testimonial but used a different analysis in his concurring opinion.  *See Williams*, 567 U.S. at 104, 183 L. Ed. 2d at 129

In *Williams*, DNA test results from samples obtained from a sexual assault victim were sent to a private laboratory for DNA testing and the Supreme Court addressed whether the test results were testimonial. *See Williams*, 567 U.S.at 56-57, 183 L. Ed. 2d at 98. At trial,

> the prosecution called an expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of [the] petitioner's blood. On direct examination, the expert testified that Cellmark was an accredited laboratory and that Cellmark provided the police with a DNA profile.
>
> . . . .
>
> The expert made no other statement that was offered for the purpose of identifying the sample of biological material used in deriving the profile or for the purpose of establishing how Cellmark handled or tested the sample. Nor did the expert vouch for the accuracy of the profile that Cellmark produced.

*Id.* Similar to the case at bar, the expert called to testify in *Williams* was an Illinois State Police analyst who received the DNA profile generated by a private, third-party lab, and through her own independent work, compared and matched the profile with DNA records in Illinois's database. *Id.* at 59, 183 L. Ed. 2d at 100.

In *Williams*, the Court explained that the Cellmark test's purpose was not

---

(Thomas, J. concurring). He disagreed with the majority opinion's ruling that the test results were not hearsay, essentially for the same reasons as the Supreme Court later ruled in *Smith v. Arizona*. *See id.* at 109, 183 L. Ed. 2d at 132 (Thomas, J., concurring). However, he agreed that the test results were not testimonial but rejected the "primary purpose" test used by the majority opinion. *See id.* at 113-14, 183 L. Ed. 2d at 135 (Thomas, J. concurring).

testimonial, and this was an independent basis for the decision:

> As a second, independent basis for our decision, we also conclude that even if the report produced by Cellmark had been admitted into evidence, there would have been no Confrontation Clause violation. The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today. The use of DNA evidence to exonerate persons who have been wrongfully accused or convicted is well known. If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial.

*Id.* at 58-59, 183 L. Ed. 2d. at 99 (citation omitted). Here, just as in *Williams*, Robin's sexual assault test kit was sent to Sorenson before Defendant was identified as a potential suspect. Robin's test kit went undisturbed for many years as the Greenville Police Department did not have enough evidence or resources at the time to move forward with the investigation. No progress occurred on solving Robin's case until

the police department received funding specifically for testing un-tested sexual assault kits. Robin's test kit was delivered to Sorenson for the sole purpose of identifying the potential presence of any DNA other than her own, not to identify a potential suspect. Sorenson's DNA profile was not testimonial in nature since it was not generated "*solely* to aid in the police investigation" of Defendant. *Clark*, ___ N.C. App. at ___, 909 S.E.2d at 570 (emphasis original). And as in *Williams*, the profile provided by Sorenson "was not inherently inculpatory" but it tends to exculpate "all but one of the more than 7 billion people in the world today." *Williams,* 567 U.S. at 58, 183 L. Ed. 2d. at 99. Therefore, the trial court did not err in allowing Ms. Daniels's testimony based on her comparison of Defendant's DNA profile with the DNA profile generated by Sorenson because the Sorenson report was not testimonial.

### 3. *Harmless Error*

Recognizing the evolving state of the law regarding use of lab testing results in this type of case, as a second and independent basis for our decision, if Defendant's confrontation rights were violated by the use of the Sorenson test results, this violation only amounts to harmless error.

> When violations of a defendant's rights under the United States Constitution are alleged, harmless error review functions the same way in both federal and state courts. A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

*State v. Ortiz-Zape,* 367 N.C. 1, 13, 743 S.E.2d 156, 164 (2013) (citations and quotation marks omitted). Our Supreme Court has held admissions of testimonial evidence will be construed as "harmless error" in relation to an alleged Confrontation Clause violation where there is "other competent overwhelming evidence of [the] defendant's guilt[.]" *State v. Lewis,* 361 N.C. 541, 544, 648 S.E.2d 824, 827 (2007) (citation and quotation marks omitted).

In *Ortiz-Zape*, our Supreme Court concluded an alleged Confrontation Clause violation was harmless error where

> [t]he arresting officer testified that when he found the plastic baggy containing a white substance, he picked it up and asked [the] defendant, "What's this?" The officer further testified that defendant acknowledged it was his cocaine—and asserted it was for personal use and he was not dealing drugs.
>
> . . . .
>
> Under these facts, in which [the] defendant told a law enforcement officer that the substance was cocaine and defense counsel elicited testimony that the substance appeared to be cocaine, any possible error in allowing the expert opinion was harmless.

*Ortiz-Zape,* 367 N.C at 14, 743 S.E.2d at 164-65 (citation omitted).

At trial, Detective Cunningham testified as to statements made by Defendant during an interview conducted in November of 2021. Detective Cunningham testified that during this interview Defendant recalled his interactions with Robin that day at the pool, describing her as "drunk" but alleged she was "not impaired to the point she

was incapacitated[.]" Defendant also admitted to being present in the room where the incident occurred and to having sex with Robin until "she jumped up and ran out of the room." The statements made by Defendant during this interview corroborated many events described by Robin in her testimony. The entire purpose of the DNA evidence was to identify Defendant as the man who sexually assaulted Robin in 2011; Defendant admitted that he met Robin at the pool that day and had sex with her.

Under these facts, there was substantial evidence to convict Defendant of second-degree rape, even without the testimony of Ms. Daniels. Even if Defendant's Confrontation Clause rights were implicated, the admission of Ms. Daniels's testimony amounts only to harmless error.

### III. Conclusion

We conclude no error was committed by the trial court as to the issues raised in Defendant's appeal. The instructions provided to the jury did not deprive Defendant of a unanimous verdict, nor were they disjunctive in outlining multiple avenues for finding Defendant guilty. Also, the trial court did not err in denying Defendant's motion to dismiss as there was substantial evidence that he had committed second-degree rape. Finally, though the DNA profile generated by Sorenson was hearsay evidence, Defendant's Confrontation Clause rights were not violated because these out-of-court lab results were not testimonial in nature.

NO ERROR.

Judges CARPENTER and GRIFFIN concur.